Good morning, we'll now hear the case of Harrius Johnson v. Miami Dade County. Good morning to you. Good morning, Your Honors. May it please the Court, Anthony Georges-Pierre with the Law Offices of Riemer and Georges-Pierre on behalf of the Plaintiff Appellant Harrius Johnson. Your Honors, this is a very straightforward matter. The lower court ruled improperly, incorrectly. The lower court, in fact, did not apply the applicable standard with regard to comparators, with regard to pretext. This case has an overwhelming abundance of evidentiary documentation as well as testimony from Mr. Johnson himself, both his affidavit, which wasn't taken into consideration. The lower court, in fact, stated that he did not assert personal knowledge when in fact throughout the entire affidavit he indicates in detail specific experiences that he encountered which rise to the level of having the county, the appellee in this matter, violating his Title VII, his Florida Civil Rights Act violations, as well as his 42 U.S.C. 1983 rights. His constitutional rights were violated, they were ratified by the mayor, Carlos Jimenez, directly specifically by evidence that was inserted in the response to the summary judgment wherein it indicates clearly where the mayor acknowledges having reviewed and made a determination. Ultimately speaking, there was a convincing mosaic of suspicious timing of when certain retaliatory actions were performed and committed against Mr. Johnson, systematically better treatment of similarly situated personnel. You have a number of comparators both who are similarly situated in terms of duties, responsibilities, titles, positions held, even during a relevant time period. You have the difference between the two is that the comparators are white versus Mr. Johnson, who is black, specifically that he's ultimately the decision to terminate Mr. Johnson was as a result of failure to allegedly change and update his address, as well as slamming a door, versus his comparators, other sergeants, police sergeants, who either were accused of fraud, violation of personnel policies, failure to update addresses, and so forth. In addition, you have a certain number of individuals who were presented as comparators for the fact that they received far worse actions than Mr. Johnson was accused of. Speaking of comparators, I would assume that you've had to rethink this case a little bit in light of the court's en banc decision in Lewis because that was issued March 21st. That's correct, Your Honor. If that's true, you've had to rethink your case a little bit. Tell me what effect that's had on your client's ability to prevail. It actually confirms my client's ability to prevail. It establishes clear-cut that the number of comparators that my client presented, both as to the level of actual retaliatory discharge, escalations of examples, in terms of the simile situated, in terms of duties, responsibilities, policies, and protocols. The guidelines in the en banc decision, Lewis versus Union City. The city of Union City. Georgia. Rise to the level where the comparators exactly fall in face and are similar in material aspects as my client. This was presented. This was presented in terms of Captain Tyrone White's deposition testimony, where he clearly establishes and confirms in his own deposition. J.D. Patterson, the director, who ultimately made the decision to terminate my client, details specifically the basis for his termination. The en banc decision helps my case. It does not hurt my case. It confirms proof positive that the lower court should have taken into consideration a certain number of facts that were presented. The lower court should have taken into consideration the affidavit that was filed, the number of documentary evidence presented, establishing a general material issue of fact. Furthermore, the fact that the county did not rebut or controvert a lot of the statement of facts that was presented, means that it was deemed admitted just from the rule of procedure alone. We firmly believe that the lower court misapplied the standard at that time and this new standard, which is not much different than the last, but specifically that there was sufficient basis to confirm that there was a level of reliability in terms of evidence to allow a jury to hear this case. There's no further questions. I want to ask you about, I mean, part of the question about the adverse employment action has to do with these, what you refer to as the negative monthly evaluations. I couldn't find those in the record on appeal. Are they in the record on appeal, and if so, where? The negative monthly evaluations? Yes, sir, because, I mean, that was, and that's part of your argument, as I understand it, that the negative monthly evaluations were the adverse employment action. That, well, that's one of the many actions. Right, but are they, I couldn't find them. Are they in the record on appeal? I'm not mistaken. They are in the record. They're affiliated, they're attached to the deposition transcript of Lieutenant Roselli as part of the exhibits that were asserted in that. Okay, I don't, what, what do they say? Since I hadn't looked at them, because. It's the temporal proximity of when certain complaints were made by my client in a short order, a month thereafter. He's being written up and, and certain investigations. There's one specific incident where he was involved in a shooting where he appeared as backup to a rookie police officer who was, who, who, where three males were, were involved in shootings and carjackings. He appeared in those shootings, he drew his, his revolver, a service revolver, and ultimately fired. And as a result, there's an investigation through the pro, police protocols that occur. And typically those investigations last a certain extent of period of time. On the heels of his complaint of filing, of charge of discrimination to the EEOC, certain allegations were made that, that in fact it was an, an improper shootings. That D, DARs, disciplinary action reports were having to be changed. And Lieutenant Roselli, who's one of the key individuals who my client is claiming has discriminated, is one of the discriminators, is part of the, part of the process of violating the protocols and policies. And who, who is then a subject of emails to key personnel, both at the, at the, in the hierarchy of the police department, as well as at the county and mayor's office level. You know, assuming we get to, to pretext it seemed like to me that the, you know, kind of the last straw was when, when your client slammed the door and, and locked his, I mean, not intentionally, but ended up locking his supervisors in this room. I mean, what's your best evidence that, that, that was pretextual? I mean, it's, it's pretty bad. Like, I, I wouldn't like it if my law clerks locked me in my office. But your honor, the description of the door being slammed, that's an allegations asserted by, by the county. In fact, the, there was knowledge that the door was defective. There was knowledge that, that the, that there wasn't even the right of occupancy in the building and facility itself. My client steps out of the room with this meeting to go to a copy machine. Upon return, after advising them that his, he has health concerns, that he's going to the doctor, he's not feeling well, and, and he, he leaves. And he closes the door, he doesn't necessarily slam the door. This is an allegation. The fact that it, that, that the mechanism locks them in, it should not be attributed to his, a fault of his. They say that that's the last straw that broke the camel's back, as they say. But the reality of the matter is this, is that, that's just a, a, a low level basis to find a justification on their part to, to assert a pretext. The reality of the matter is this, is a number of prior incidents indicate and attempt to, to, to, to discriminate against my client. He had filed a number of charges of discriminations. He had followed, filed claims within the, the internal hierarchy of the police department. His, his comparators who have done far more, worse things, for instance, is sexually molesting children in their custody. And, and, and, and still are, are allowed to continue to be gainfully employed. My client has over 20 years with the, with the Miami-Dade County Police Department. The, the proximity of time of how long it took for them to ultimately start writing him up to, to find a way and basis to, to terminate him, it justifies and confirms that in fact there was some discriminatory animus against him. Who's your best comparator? My best comparator, I would have to say, is, is Sergeant Atherley. Sergeant Atherley is, is an individual who, who's, who's similarly situated. Who's similarly situated in, in terms of time on the force. Prior write-ups, similarly situated in terms of, of status and title and duties and responsibilities. That he was accused of certain things and, and found guilty of those items. And, and initially was, was going to be terminated, but instead, they entered into a memorandum of understanding and allowed him to continue to be gainfully employed. Versus my client, who allegedly slammed a door and failed to update his personnel file, gets outright terminated.  Thank you, honors. Good morning. Good morning. May it please the court. Marlon Moffitt on behalf of the, a defendant, I believe, Miami-Dade County. The county requests that this court affirm the district court's order granting summary judgment to the county on plaintiff's race discrimination and retaliation claims and all the claims in the complaint for the reasons set forth in our brief, brief. In this case the plaintiff has never denied that he committed the disturbing misconduct documented in his disciplinary action reports that led to his suspensions and termination from the Miami-Dade Police Department. It is therefore undisputed the court held that the county had legitimate, non-discriminatory, non-retaliatory reasons for terminating the plaintiff. Based on his multiple violations of the county's rules against insubordination, disrespective authority, lack of professional judgment, espe, especially as a police sergeant in a paramilitary organization such as the Miami-Dade Police Department. In light of these undisputed facts, the district court focused its analysis on plaintiff's failure to establish pretext, as will I. As your honor first pointed out however I, I will address this since you pointed it out in your questioning the monthly evaluations are not adverse employment actions. Are they in the record? You agree that they're attached to the deposition? No, I, I don't think they're in the record. As I pointed out in my brief, they're not there. In addition to that there's no evidence that these monthly evaluations had any impact on his pay, his status as a police officer, the terms and conditions of his employment. In fact, monthly evaluations I can represent to the court do not have any effect on the terms and conditions of employment. And in fact, plaintiff admitted, I'm sorry. I mean, I don't know whether they do or, or they don't because they're not in the record. I mean, I don't know what they say. But I mean, I, I'm gonna check the, the place you told me to look. But if they're not in the record, then how do we know whether they helped him or hurt him or? I think that's absolutely correct. If they're not in the record, we don't. But even if they were, they're not materially adverse. And plaintiff admitted that when he, I, I, I guess addressed the supervisor about the negative comments that were in his monthly evaluation, that eventually the monthly evaluations were rescind, rescinded. And so he admits that, and that's in the record. As to the comparators, your honor, your honors. This case is controlled by the 11th Circuit's recent en banc decision in Lewis versus Union City, which clarified that a proffered comparator must be similarly situated in all material respect. I'm not sure I agree that it clarified, but when you get so many judges involved in an opinion, it's, it's complicated. I, I understand. But certainly the majority opinion specifically said that the proper comparator must be similarly situated in all material respects. And I would submit that if you substitute that language for the nearly identical language that was in the district court's order, you would come, you would come to the same conclusion, the same outcome. A month ago. Can I, can I just follow up on that? So the, the other side says the best comparator is Sergeant Atherley. And as I understand what happened to Sergeant Atherley was that he was found to have falsified payroll records. And, and, I mean, because, you know, there was misconduct on his part. But it was a different kind of misconduct. Do you, is it your position that he cannot be used as a comparator? Yes. Under Lewis. Under Lewis. Under Lewis, a similarly situated comparator will have normally or generally, quote, engaged in the same basic conduct or misconduct as the plaintiff. And under this court's precedent, there are many cases in which the court looks at the type of conduct that's involved. In assessing whether a comparator is, is valid. In this case, we're talking about plaintiff's conduct, which was insubordination, disrespective authority, lack of professional judgment. Maybe falsifying payroll records is a lack of professional judgment. Possibly, but that's not the rule that was cited in Sergeant Atherley's disciplinary action. Falsifying time records is a separate rule violation that he was charged with. The conduct is not the same in terms of actually, you know,  disrespecting your superiors and your supervisors. I mean, in this case, plaintiff attended several meetings where he openly and blatantly was rude and disrespectful to his supervisors. And when they asked him to stay at the meeting. What would somebody have to do to be a comparator? I mean, let's just say, hypothetically, Mr. Johnson had five instances of insubordination, or what was viewed by the supervisors to be insubordination. And there's another person who has four. Is that same or similar? Or do they have to have exactly the same number of instances? I don't think they have to have exactly the same number of instances. What about, what about one? Well, one versus four or five, I think is, is, is significantly different. Okay, what about, what about, what about three, three and five? Well, I can only go by what the court has said. For example, in Manasseh, a female plaintiff with four violations was not similarly situated to males that each had one. And so there has been some guidance in the case law as to the, the quantum of, of, of violations in the history. But remember, remember the history and the type of misconduct are, are two different factors that the courts look at. What, when determined, determining whether a, a comparator is similarly situated. In this case, Sergeant Atherley had only three incidents that are in the record. Concerning his disciplinary history. Plaintiff, on the other hand, had 12 incidents. And certainly, if four versus one, one is insufficient under Manasseh. 12 versus three is along the same lines. I would also submit that Sergeant Atherley was actually treated more favorably than plaintiff, I mean, I'm sorry, less favorably than the plaintiff when it comes to Sergeant Atherley's history prior to his demotion, which is in and of itself a very severe penalty, especially for the first instance of falsifying time records. But prior to that, he only had one ten day suspension for conduct that was also dissimilar in terms of turning off his, the GPS in his, in his police vehicle. And so Sergeant, whereas Sergeant Atherley received a very severe penalty of demotion after only the second instance, plaintiff was given chance after chance after chance to correct his behavior, multiple records of counselings, written reprimands, three five day suspensions before he was ever considered for termination. When you're ready, I, I, I think I've kept Mr. George Pierre from talking about the retaliation claim, but that seems to me to be interesting from, from your stand, standpoint, because as I understand the record, Director Patterson knew about Mr. Johnson's EEOC complaints at the time he, he terminated him. And that, I mean, that's, so there's some causal connection, or at least for the prima facie case, there's knowledge on the part of the, the person who terminated Mr. Johnson. Right, as I pointed out in my brief, just looking at the prima facie case, because plaintiff complained to the EEOC nine times, and it is not surprising that those complaints overlapped with some of his disciplinary actions. But what plaintiff has to show for the prima facie case is the causal connection. And that causal connection requires proof or some indicia that the complaints were the reason, the but for cause. But timing is part of that, right? Timing is part of that, but temporal proximity alone the courts have held is insufficient to establish a causal connection, especially, excuse me, especially where, as we have here, the plaintiff was already being disciplined prior to the initiation of the complaints, and then discipline continued afterwards. That was the case in the Hill versus SunTrust Bank case in 2018, where the court held that there was no causal connection where the discipline had started before the complaint was ever lodged. Here you have this extensive disciplinary history that had already begun years prior to the first complaint. Plaintiff alleges and focuses in his reply brief on this July 2013 email that he sent to Lieutenant Roselli. And then he claims that after that, Lieutenant Roselli began retaliating against him with these lower monthly evaluations and other things that are not adverse employment actions. And so our position is that the temporal proximity alone is insufficient because the record establishes that the discipline was occurring both before and after the complaints. But at the end of the day, that's the prima facie case. And I don't think it really matters, and it doesn't mean that the plaintiff wins. Because as the district court analyzed, a plaintiff failed to establish that the legitimate non-retaliatory reasons were a pretext for retaliation. And the only evidence- You're not conceding a prima facie case on retaliation, are you? Absolutely not. But even assuming that plaintiff were able to establish a prima facie case on retaliation, he fails to establish pretext as to the legitimate non-retaliatory reasons for his termination. Okay. Can I just ask you to respond to the argument about the incident where the door was shut and the supervisors were locked in the room? Your opposing counsel says, well, that's just more reason why this shouldn't have been a summary judgment grant because there's a factual dispute about what even happened there. Well, respectfully, I disagree with that. In this particular case, first, the plaintiff's excuses about how and why the door locked are irrelevant. What's important and what the courts have to focus on is the conduct from the employer's perspective. And as Your Honor pointed out, slamming a door in and of itself, whether the door locked or not, when you're in a meeting with your supervisor, is disrespectful. It is a lack of professional judgment. And it is disrespectful insubordinate conduct, especially whereas here, the supervisors had asked him to stay in the room because they were conducting official disciplinary business with regard to Mr. Johnson. He flagrantly disobeyed their orders to remain in the room and left the room and slammed the door with such force that it caused a . . . I mean, my point is there's a fact dispute about that. Well, in cases where plaintiffs have argued that their conduct was less egregious or not as bad as other people who were disciplined less severely, the courts have rejected those arguments because the courts does not sit as a super-personnel department to evaluate whether some conduct is more severe than other conduct. And in this case, he's saying, oh, you know, I slammed the door and that's not a big deal, whereas these other people engaged in conduct that the plaintiff believes is more severe. And the courts have repeatedly held that, as in the Feist case, 683F Appendix 746, 11th Circuit, 2017, the appropriate question is not whether the comparator's alleged violations were worse than the plaintiff's, but instead whether the comparator's violations were sufficiently similar. So the question is not the severity or what actually happened there. That's not the dispute of fact that's material in determining whether the plaintiff has established pretext. I believe your time has expired. Yes. I see that my time has expired, so I thank you for your attention. We would respectfully request that the court affirm the district court's grant of summary judgment to the county. Thank you. Thank you. In response to, with regard to Atherley being a comparator, if in fact the court makes a determination that he's not a comparator, it's very clear that this court has in the past, in the case of Smith v. Lockheed Martin, the 11th Circuit has repeatedly affirmed the plaintiff's failure to produce a comparator does not necessarily do in the plaintiff's case. However, there are plenty of other . . . I'm just in this time period where I'm trying to figure out who can be a comparator in any case, so that was kind of my point. Since Lewis is so new . . . Absolutely. Lewis is so new, but Lewis makes a clear point in saying that just as doppelgangers and unicorns don't exist, actual mirror image comparators also don't exist. This case has sufficient record evidence wherein we detail specifically, for instance, Sergeant Philip Veloso, a white male who failed to update his address and personnel, that information, just as the plaintiff appellant did here, and he, instead of being terminated, received a record of counseling. So if you want to compare apples to apples, there's an apple right there. Tell me that comparator's name again. It's Philip Veloso, V-E-L-O-S-O. He failed to update his personnel file and in lieu of being terminated, like my client was terminated, he received a record of counseling. We've listed more than ten comparators. A number of them similarly situate in terms of title, duties, responsibilities, and by the way, all the comparators fall under the category of being overseen by the collective bargaining agreement between the police officers, irrespective of ranks. The policies and protocols, the system in itself, the various policies that govern the Miami-Dade Police Department, all of the comparators, all the individuals, whether they're considered comparators or not, they must adhere to those principles. Actions, unbecoming an officer, irrespective of rank, falls into that category. Personnel misconduct fall under irrespective of rank, irrespective of violation. It's a catch-all, a number of these policies. The system is structured and set up in a fashion, quite frankly, to make it easy for this defendant to come forward with a pretext justification for the discriminatory animus. The temporal proximity of time as to when, in fact, my client was being retaliated against is very clear in the record. We have a number of the EEOC charges that are within this record. They detail specifically what transpired. My client's affidavit in response to an opposition to the summary judgment, which quite frankly, the lower court did not take into consideration and even states it doesn't take that into consideration. When in fact, all the material elements necessary for a valid affidavit to be submitted. It would have been admissible in testimony if it went to trial. There's sufficient issues of fact that demonstrate that this should have been allowed to go before a jury. Can I just follow up? We hear a lot of cases in a week and I just want to make sure I understand. You say Sergeant Veloso is an identical comparator because both Sergeant Veloso and your client didn't update the address in their personnel file. Correct. My client was terminated and while Mr. Veloso just simply received a record of counseling. Did Sergeant Veloso have other things that he was . . . other misconduct in the workplace? Yes, Your Honor. He had a history of prior discipline. Sergeant Veloso did? Yes, ma'am. As a matter of fact, it's very difficult for an employee to be an outstanding employee of the county, reach the level of sergeant, meaning you qualify a number of years, pass a test, and not have some kind of slight. There is no such thing as perfection in the workplace. We may endeavor and strive to reach that, however . . . Your client was far from perfect. That is correct, Your Honor. We don't say he was perfect. We say that he was a duty-bound employee. He was loyal to the organization. He followed protocols. He wrote up individuals. I'm sorry? He wanted to. This is a record, as I read it, of not incidental passing of misconduct. I mean, it's a long record of misconduct. Your Honor, if I may, at some point in time . . . Going back to 2000, my client entered into a settlement agreement with the county, confidential settlement agreement, one of the key terms in that agreement was that they were supposed to purge a number of these write-ups that supposedly, allegedly, were taken into consideration. In fact, he is similar to Atherley in terms of Atherley supposedly having three or four reprimands, write-ups, disciplinary actions. My client does not have the 12th because a number of those should not have even been available to be seen by Director J.D. Patterson or anyone else for that matter, because pursuant to a confidential settlement agreement, a number of those from E through K, which are listed in the record, were supposed to have been purged, and therefore placing . . . You're saying that there was even more misconduct that we weren't supposed to look at? No, Your Honor. I'm not saying that. I'm saying that . . . Pursuant to that settlement agreement. I'm saying that what you see presented by the defendant appellee, a number of those should not have been presented, should not have even been available because that was pursuant to a confidential agreement, that where it was established and found and discovered that errors were made on their part and they agreed to resolve the matter. I see. Therefore, in fact, three to four potential disciplinary past actions, very similar to Sergeant Atherley's disciplinary actions. You have, in fact, a comparator that should have been taken into consideration by the lower court and was not, where one performed actual fraud, was found guilty of that fraud, and was allowed to maintain his gainful employment versus my client who's allegedly slammed a door, allegedly failed to update his personnel file, and was terminated after a long extensive years having passed various exams to reach the level of sergeant, had just taken the lieutenant's exam and passed that exam. If you find yourself in a situation where the motto of protect and serve, where my client took that very serious, where in fact he attempted diligently to be an ideal police officer, an actual sergeant, where he was supervising a number of individuals who are out in the community, where community members were coming and complaining specifically of their treatment and actions. In this day and age where police officers are not necessarily always held in high regard by the community, certain individuals who stand out for doing things to the community then should be documented, written up because of violations of the actual policies. Thank you. Your time is up. Thank you, Your Honors. I appreciate it, and I ask that you reverse and remand. Thank you. Thank you. That concludes court for the day.